UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

VIANNA AUSTIN,

             Plaintiff,

vs.                                         Case No.  3:06-cv-265-J-20MCR

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,[1]

             Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[2]

This cause is before the Court on Plaintiff's appeal of an administrative decision

denying her application for Social Security benefits.  The Court has thoroughly reviewed

the record, the briefs and the applicable law.  For the reasons set forth herein, the

Commissioner's decision is **REVERSED** and **REMANDED** for proceedings not

inconsistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits ("DIB") and

Supplemental Security Income benefits ("SSI") on January 29, 2002, alleging an inability

to work since April 25, 2001 due to cervical spondylosis, ruptured discs with pressure on

spinal cord, degenerative disc disease with spurs, and narrowing of the C3 and C4 with

_____

[1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as
Commissioner of the Social Security Administration.  See Rule 25(d)(1), Fed.R.Civ.P.

[2] The parties consented to a United States Magistrate Judge exercising jurisdiction.  (Doc.
14).

no feeling in both arms.  (Tr. 59, 61, 94).  The Social Security Administration ("SSA")

denied this application initially and on reconsideration. (Tr. 29, 33-39).  Plaintiff then

requested and received a hearing before an Administrative Law Judge ("ALJ") on June

29, 2004.  (Tr. 406-33).  On March 21, 2005, the ALJ issued a decision finding Plaintiff

was not disabled.  (Tr. 14-25).  Plaintiff filed a Request for Review by the Appeals

Council, which was denied on January 28, 2006 (Tr. 5-10), thus making the ALJ's

decision the final decision of the Commissioner.  Plaintiff timely filed her Complaint in

the U.S. District Court on March 23, 2006.  (Doc. 1).

## II.    NATURE OF DISABILITY CLAIM

### A.    Basis of Claimed Disability

Plaintiff claims to be disabled since November 1, 2001[3] due to cervical

spondylosis, ruptured discs with pressure on spinal cord, degenerative disc disease with

spurs, and narrowing of the C3 and C4 with no feeling in both arms.  (Tr. 59, 61, 94).

### B.    Summary of Evidence Before the ALJ

Plaintiff was fifty-seven years of age on the date the ALJ's decision was issued.

(Tr. 410).  She graduated from high school and has past relevant work experience as a

medical assistant in a physician's office and library assistant at an elementary school.

(Tr. 95, 410).  Plaintiff's relevant medical history is discussed below.  By way of

summary, Plaintiff testified she stopped working as a medical assistant in a doctor's

office in November 2001 due to pain resulting from a herniated disc or degenerative

---

[3] At the hearing before the ALJ, Plaintiff amended her onset date from April 25, 2001 to November 1, 2001.  (Tr. 409).

disc disease, and spurs on her vertebrae.  (Tr. 410-11).  Plaintiff was diagnosed with

lumbar pain and polyneuropathy.  (Tr. 223).  Plaintiff's medical history also includes

cervical and lumbar pain and injuries (Tr. 146-49), Grave's disease (Tr. 150-72),

hypertension (Tr. 150-51), and a fibroid uterus (Tr. 346).

In February 1998, Plaintiff fell and injured her neck, shoulder, back and wrist.

(Tr. 148).  On April 2, 1998, James Dolan, M.D., diagnosed cervical strain and disc

degeneration, facet arthritis, thoracic contusion, ulnar nerve contusion at the cubital

tunnel and a grade II tear of the distal radial ulnar joint in the left wrist.  (Tr. 147).  Dr.

Dolan prescribed anti-inflammatory medication and physical therapy, and instructed

Plaintiff to remain off duty from work.  (Tr. 144-49).  On June 17, 1998, Dr. Dolan

described Plaintiff's condition as "chronic" and therefore, he would not schedule another

regular appointment with her but would continue to prescribe anti-inflammatories.  (Tr.

143).  On July 22, 1998, after three months of treatment, Dr. Dolan authorized Plaintiff

to return to "light duty" work with multiple permanent exertional limitations related to

shoulder and back, including "no pushing or lifting greater than 10 lbs."  (Tr. 142).[4]

Plaintiff returned to Dr. Dolan three times.  During one visit on December 30,

1998, Plaintiff had visible swelling along the trapezius muscle and continued dislocating

of the left distal ulnar radial joint.  (Tr. 139).  Dr. Dolan noted the only other possible

---

[4]  Plaintiff attempted to return to her job as a library assistant in 1998, but the employer
would not accommodate her work restriction.  (Tr. 425).  From August 2000 through April 2001,
Plaintiff worked as a medical assistant in a doctor's office, but testified she frequently missed work
because of pain and sleeplessness from physical injuries and other medical problems.  (Tr. 103,
410-12).

treatment option was a joint resection that "would give her some improvement, but certainly not complete relief" and did not recommend the procedure.  Id.

A cervical spine MRI conducted June 29, 2001, showed disc herniation "resulting in mild to moderate mass effect upon the cord."  (Tr. 213).  On July 5, 2001, Plaintiff's primary care physician reviewed Plaintiff's MRI results, observed numerous musculoskeletal motion limitations, spasms, tenderness, swelling, decreased sensation and decreased grip strength, and referred her to a neurosurgeon.  (Tr. 212).  On July 18, 2001, neurosurgeon Walter Faillace, M.D., diagnosed cervical lumbar spondylosis and referred Plaintiff to a pain management clinic and physical therapist.  (Tr. 299-300).  At her initial physical therapy evaluation, Plaintiff exhibited increased thoracic spinal curvature with forward head posture and rounded shoulders, pelvic misalignment, and painful limited motion in lumbar flexion, extension and rotation.  (Tr. 221).

On August 13, 2001, Plaintiff underwent lumbosacral and cervical spine MRIs that showed "mild bilateral facet joint arthropathy of L5, . . . mild to moderate degenerative changes, . . . osteophyte formation and sclerosis, disc space narrowing most severe at C3-C4,  [and] bilateral narrowing of the neural foramina most severe at C3-C4."  (Tr. 297-98).  On September 19, 2001, after sixteen physical therapy treatment sessions, Plaintiff was discharged showing improvement to her cervical but not lumbar spine.  (Tr. 220).

Plaintiff then saw neurologist Jacob Green, M.D., Ph.D., who, based on MRI results, concluded Plaintiff had a thecal sac bulge and cervical disc rupture and

diagnosed Plaintiff with cervical myelopathy secondary to herniated disc.  (Tr. 222-23, 237).  Dr. Green ordered Plaintiff to see a neurosurgeon.  (Tr. 222).

On May 21, 2002, Plaintiff underwent EMG/nerve conduction studies and exhibited mild active denervation in the right C6-C7 paraspinal muscles, "reduced voluntary motor unit recruitment in the abductor pollicis brevis muscles bilaterally" and "electrophysiologic evidence of bilateral median nerve entrapments at the wrists." (Tr. 275-76).  On June 4, 2002, lumbosacral EMG/nerve conduction studies showed Plaintiff had active denervation of the right L4-L5 paraspinal muscles that was "suggestive but not definitive evidence for lumbosacral radiculopathy."  (Tr. 273-74).

On June 6, 2002, neurologist Jose Merino, M.D., diagnosed Plaintiff with carpal tunnel syndrome, low back pain, neck pain and probable lumbar radiculopathy.  (Tr. 271-72).  Dr. Merino prescribed splints, started Plaintiff on Neurontin and referred Plaintiff to neurosurgery for carpal tunnel release.  (Tr. 272).  On August 8, 2002, Dr. Merino reported Plaintiff had seen a neurosurgeon as ordered, but the surgeon, Dr. Faillace, did not recommend surgery and instead gave Plaintiff "an elbow splint and referred her to rheumatology for evaluation of fibromyalgia."  (Tr. 269).

On August 8, 2002, Dr. Merino found Plaintiff had positive Tinel's sign at the elbow, weakness of the abductor pollicis brevis and finger flexors and pain along her elbow and shoulder caused by any hand movement.  Id.  Dr. Merino diagnosed cervical radiculopathy and ulnar nerve entrapment and doubled Plaintiff's prescribed dose of Neurontin.  (Tr. 269-70).  On  a questionnaire dated October 23, 2002, a Shands

Neuroscience Institute physician[5] indicated Plaintiff had no joint-related motion loss or deformity, but did have significant intrinsic hand muscle weakness, grip strength reduced to 3/5, rapid finger movement loss, a "slow, hesitant, broad-based gait," and inability to squat or walk on her toes. (Tr. 317).

On July 8, 2003, Plaintiff underwent six lumbar trigger point injections at Shands Pain Management Clinic. (Tr. 372). On July 22, 2003, Plaintiff received six additional trigger point injections. (Tr. 371). On September 22, 2003, Plaintiff reported the trigger point injections had helped the pain, but during the examination, Plaintiff developed a slight limp "after significant ambulation of 40 to 50 feet." (Tr. 365). On October 13, 2003, Plaintiff reported the trigger point injections had lessened her pain level for approximately 2-3 weeks but the pain had worsened again and Dr. Stenberg scheduled Plaintiff for a lumbar epidural steroid injection. (Tr. 363). On November 5, 2003, Dr. Stenberg attempted to administer a lumbar epidural steroid injection but aborted the procedure because they had a "wet tap" and Plaintiff developed a post-dural puncture headache. (Tr. 359-61).

On November 10, 2003, Plaintiff declined additional trigger point injections and elected to use Flexeril, Motrin, Ultracet and Phenergan for nausea, pain and muscle relaxation. (Tr. 356-57). On December 5, 2003, Dr. Stenberg noted "tenderness to palpation" in multiple areas and diagnosed probable cervical and lumbar myofascial pain syndrome with possible L-5, S-1 degenerative disc disease. (Tr. 353A-54). Dr. Stenberg prescribed Celebrex as a substitute for Ibuprofen and Tramadol as a

---

[5] The signature appears to be "J. Merino," Plaintiff's treating neurologist.

substitute for Gabapentin.  Id.  On February 4, 2004, Plaintiff underwent a lumbar spine

MRI that showed a small bulging disc and degenerative changes at L5-S1.  (Tr. 347).

At the request of the Social Security Administration, Plaintiff underwent three

consultative physical examinations conducted by Timothy McCormick, D.O., Thao Le,

M.D., and Hung Tran, M.D.  (Tr. 194-99, 238-42, 251-54, 318-22).  On April 28, 2000,

Dr. McCormick observed diminished reflexes and pain behaviors including sighing and

slow movement.  (Tr. 196-97).  Plaintiff's bilateral supine SLR was limited to 45 degrees

and painful.  Id.  Dr. McCormick opined Plaintiff was "able to perform activities at least in

the sedentary range."[6]  (Tr. 197).

On April 24, 2002, Dr. Le found limited range of motion in Plaintiff's cervical spine

lateral flexion and rotation and in her lumbar spine forward flexion, as well as pain in the

lumbar and cervical spine.  (Tr. 240, 242).  Plaintiff's grip strength was 15 pounds

bilaterally and she "was unable to lift 20 lbs with both hands."  (Tr. 240-41).  She could

squat halfway without pain and exhibited difficulty "toe, heel walking."  (Tr. 241).  Dr. Le

diagnosed cervical spondylosis with radiculopathy, lumbar spine facet joint arthropathy,

high blood pressure, and Grave's disease.  (Tr. 241).

On November 12, 2002, Dr. Tran found Plaintiff had neck and lumbar spine pain

and limited motion, right knee pain when squatting ten inches, lumbar spine forward

flexion limited to 60 degrees compared to normal range of 90 degrees, pain at her right

elbow and wrists, tingling in her hands, weak bilateral grip and inability to lift 20 pounds

---

[6] Although this examination preceded Plaintiff's alleged disability onset date, Dr. Morford
referenced the report in a relevant RFC Assessment.  (Tr. 409, 324-25, 329).

with both hands.  (Tr. 318-22).  Plaintiff presented with a neck brace and elbow splint.

(Tr. 321).  Dr. Tran diagnosed disc degeneration in Plaintiff's neck, joint and back pain,

possible thyroid problems and high blood pressure.  (Tr. 321).

Three non-examining physicians completed Physical RFC Assessments on

Plaintiff.  (Tr. 200-07, 243-50, 323-30).  On May 23, 2000, Dr. Bancks completed the

first assessment and determined Plaintiff was occasionally able to lift and/or carry up to

20 pounds, frequently able to lift and/or carry up to 10 pounds, able to stand and/or walk

about 6 hours in an 8-hour workday, able to sit for about 6 hours in an 8-hour workday,

and had no limitations on her ability to push and/or pull.  (Tr. 201).  Plaintiff could

frequently stoop, kneel, crouch, crawl, or climb ramps or stairs, could never climb

ladders, ropes or scaffolds, and could occasionally balance.  (Tr. 202).  She had a

limited ability to reach overhead and needed to avoid concentrated exposure to extreme

cold, extreme heat or environmental hazards such as machinery and heights.  (Tr. 203-

04).

On May 1, 2002, Alan G. Tetlow, M.D., determined Plaintiff was occasionally able

to lift and/or carry up to 50 pounds, frequently able to lift and/or carry up to 25 pounds,

able to stand and/or walk about 6 hours in an 8-hour workday, able to sit for about 6

hours in an 8-hour workday, and had no limitations on her ability to push and/or pull with

upper or lower extremities.  (Tr. 244).  Plaintiff could frequently balance, kneel, crawl

and climb ramps and stairs, and could occasionally stoop, crouch, and climb ladders,

ropes and scaffolds.  Id.  Finally, Dr. Tetlow found Plaintiff should avoid concentrated

exposure to extreme cold and extreme heat.  (Tr. 247).

On November 21, 2002, Donald Warren Morford, M.D., F.A.C.P., completed the

third assessment and assigned the same exertional limitations as Dr. Bancks but also

limited Plaintiff's ability to push/pull with upper extremities and specified Plaintiff should

"avoid repetitive hand use."  (Tr. 324).  Dr. Morford determined Plaintiff could only

occasionally climb, balance, stoop, kneel, crouch, crawl or reach overhead, and should

avoid concentrated exposure to environmental hazards such as machinery or heights,

extreme cold and extreme heat.  (Tr. 325-26).

On a "Hand ADLs" questionnaire dated October 16, 2002, Plaintiff indicated

numerous tasks she could not perform or had to modify.  (Tr. 315-16).  Plaintiff reported

she was able to "hold a mug with both hands but not a coffee cup." (Tr. 315).  She could

only dress herself if she wore pants with elastic, a t-shirt with no buttons, received help

fastening her bra and styling her hair, and slipped on shoes with no laces.  (Tr. 315-16).

At the hearing, Plaintiff testified that in November of 2001 she had to stop

working as a medical assistant because of pain resulting from "a herniated disc or

degenerative disc disease."  She described her duties as a medical assistant for

pediatrics and adults as:

> giving shots, drawing blood, or down on the floor picking up
> charts, stocking rooms . . . helping patients undress.
> Children – had to pick them up.  Sit them on the examining
> table.  Help patients on the examining table and off the
> examining table . . . [The children I picked up weighed] about
> 50 pounds some of them.

(Tr. 412).  Plaintiff is right-handed, but "drops things" with her right hand.  (Tr. 410).  She

can lift a gallon jug with her left hand but not her right, and is more functional with her

left hand but cannot write with it.  (Tr. 410, 419).  Plaintiff testified she could "use a pen

for awhile" and clarified this meant she could "write [her] name [but could not] write a long letter." (Tr. 419). Plaintiff stated she sometimes watched a little television and enjoyed doing word puzzles "but after awhile . . . [she could not] do it." Id.

Plaintiff also reported pain in her back that radiated down her right leg and caused her to limp. (Tr. 413). She described sharp, excruciating pain in her neck and both shoulders that went down her arms, pain in her elbow for which her neurosurgeon prescribed an elbow splint and pain from carpal tunnel syndrome in both hands. (Tr. 414, 416). Plaintiff also stated she used a brace for each hand and her neck. (Tr. 416). She explained that she was using a cane that had not been prescribed by a doctor, but had been recommended by physicians at the pain management clinic. (Tr. 417). Plaintiff rated her average daily pain level an 8 out of 10 and testified the medicines "reduce it, but they never stop – they never stop the pain." Additionally, Plaintiff testified that her medications cause drowsiness and dizziness. (Tr. 416-17).

Plaintiff testified she could sit for about 15 minutes before she had to get up and move around, stand for about 10 or 15 minutes at one time (sometimes longer if she could lean), and walk about 100 yards leaning on something. (Tr. 418-19). Plaintiff did not cook or clean but could "put something in the microwave" and with difficulty make her own bed. (Tr. 419, 426). She liked to be around people when they came to visit. Id. Plaintiff testified she often slept late because the pain was so bad at night, and when she woke up she could sit on the side of her bed and dress herself in something she could slip on easily like a house dress. (Tr. 421).

**C.**     **Summary of the ALJ's Decision**

A plaintiff is entitled to disability benefits when she is unable to engage in

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to either result in death or last for a continuous

period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. §

404.1505.  The ALJ must follow five steps in evaluating a claim of disability.  See 20

C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful

activity, she is not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not

have any impairment or combination of impairments which significantly limit her physical

or mental ability to do basic work activities, then she does not have a severe impairment

and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet

or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent

her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth,

if a claimant's impairments (considering her residual functional capacity, age, education,

and past work) prevent her from doing other work that exists in the national economy,

then she is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion

through step four, while at step five, the burden shifts to the Commissioner.  Bowen v.

Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287 n.5 (1987).

In the instant case, the ALJ determined Plaintiff met the nondisability

requirements of the Social Security Act and was insured for benefits up through the date

of the decision.  (Tr. 25).  At step one, the ALJ found Plaintiff had not engaged in

substantial gainful activity since her alleged onset date.  (Tr. 25).  At step two, the ALJ

determined Plaintiff had "degenerative disk disease of the cervical spine with cervical

spondylosis, degenerative disk disease of the lumbar spine, Graves disease, and

epicondylitis of the right elbow."  (Tr. 19, 25).  The ALJ found these impairments

"'severe' within the meaning of the Regulations, but not 'severe' enough to meet or

medically equal, either singly or in combination [] one of the impairments listed in

Appendix 1, Subpart P, Regulations No. 4."  (Tr. 19).

 The ALJ found Plaintiff retained the residual functional capacity for:

> light exertional level work on a sustained basis with the
> ability to lift and/or carry, and push/pull 20 pounds
> occasionally and 10 pounds frequently.  She can walk and/or
> stand for approximately six hours out of an eight-hour day,
> and sit for approximately six hours out of an eight-hour day.
> She does need a change in positions at will between sitting
> and standing throughout the day.  She can perform
> occasional balancing, stooping, kneeling, crouching, crawling
> and climbing of stairs.  She can use her arms and hands for
> normal grasping, holding and turning objects but can not
> perform constant reaching or frequent overhead reaching.
> She should avoid concentrated exposure to extreme cold
> and heat.

(Tr. 24).   In making this determination, the ALJ determined Plaintiff's testimony

regarding her limitations was not entirely credible.  (Tr. 19-20, 25).  At step four, the ALJ

utilized a vocational expert ("VE") to determine if Plaintiff could perform any of her past

relevant work.  (Tr. 24).  The VE testified Plaintiff could perform her past relevant work

as a medical assistant "as that job was actually performed by the [Plaintiff] and as is

typically performed within the national economy."  (Tr. 24).  Accordingly, the ALJ found

Plaintiff was not disabled within the meaning of the Social Security Act.  Id.

## III.    STANDARDS OF LAW

### A.    The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla; the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## IV.    ANALYSIS

Plaintiff argues three issues on appeal.  First, Plaintiff argues the ALJ erred in failing to properly determine Plaintiff's residual functional capacity at step four in the sequential analysis.  (Doc. 12, pp. 18-20).  Next, Plaintiff claims the ALJ failed to present the VE with an accurate hypothetical question.  Id.  Finally, Plaintiff argues the ALJ erred in evaluating Plaintiff's credibility.  (Doc. 12, pp. 14-18).

The Court will address each of these arguments.

### A.    Whether the ALJ erred by failing to consider all relevant medical evidence in determining Plaintiff's residual functional capacity.

Plaintiff argues the ALJ erred in finding Plaintiff retained the residual functional capacity ("RFC") to perform her past work as a medical assistant.  The RFC is an assessment which is based upon all of the relevant evidence of a claimant's remaining ability to do work despite her impairments.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The ALJ must consider all of the evidence in the claimant's record when making a disability determination.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).  In addition, the ALJ must state the weight afforded to the evidence considered.  Ryan v. Heckler, 762 F.2d 939, 941 (11th Cir. 1985).  Specifically, the ALJ "should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence."  Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990).  Indeed, "[u]nless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to *obviously probative* exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (emphasis

added) (quoting <u>Stawls v. Califano</u>, 596 F.2d 1209, 1213 (4th Cir. 1979)).  Although the ALJ is required to consider all of the evidence, he is not required to discuss all of the evidence presented, but rather must explain why "significant probative evidence has been rejected."  <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

In this case, Plaintiff argues the ALJ ignored medical evidence submitted to Plaintiff's file after Dr. Morford assessed Plaintiff's claim.  (Doc. 12, p.19).  After Dr. Morford reviewed Plaintiff's claim, Plaintiff "had multiple trigger point injections, an aborted epidural steroid injection, an x-ray of the right knee showing narrowing of the joint compartments, and an additional x-ray and MRI of the spine."  <u>Id.</u>  Plaintiff argues she was unable to effectively control her pain because the trigger point injections temporarily improved her symptoms but did not eliminate her pain and she had a severe adverse reaction to the potentially more effective epidural steroid injection procedure. (Doc. 12, pp. 19-20, Tr. 356-57, 359-61, 365).  Plaintiff suggests this inability to control her pain restricts the length of time she can comfortably sit and stand and the distance she can walk without leaning.  (Doc. 12, p.10, Tr. 432).

Here, the ALJ did discuss the trigger point injections and their limited effectiveness but did not specifically reference the epidural steroid injection, subsequent x-rays or MRI conducted after Dr. Morford's review of Plaintiff's medical records.  (Tr. 21).  At issue is whether the epidural treatment, x-rays and MRI were "obviously probative" evidence of additional limitations.  <u>See</u> <u>Cowart</u>, 662 F.2d at 735.  The undersigned finds that Dr. Morford's assessment, which limited Plaintiff's ability to sit, stand, stoop and kneel, adequately addressed Plaintiff's limitations and the epidural treatment,  x-rays and MRI results do not support any further restrictions.  (Tr. 324-26).

Furthermore, the ALJ did not adopt Dr. Morford's opinion without reference to Plaintiff's other medical evidence, but rather found that "based on the objective medical evidence, it [was] reasonable to conclude that [Plaintiff] would have some expected limitations in her capacity for prolonged sitting, standing and/or walking" and that Dr. Morford's opinions were "generally consistent with and supported by the evidence as a whole." As the Commissioner correctly noted, "[i]t is Plaintiff's burden to prove her disability, and Plaintiff failed to provide any medical opinion based on objective evidence or other credible evidence which demonstrates that she has limitations in excess of those determined by the ALJ." (Doc. 13, p.12). Accordingly, the Court finds no error in the ALJ's failure to explicitly discuss Plaintiff's epidural injection or the x-rays and MRI conducted after Dr. Morford's review of Plaintiff's records.

**B.** **Whether the ALJ erred in posing an inaccurate hypothetical to the vocational expert.**

Plaintiff argues the hypothetical posed to the vocational expert (VE) did not accurately reflect all of Plaintiff's limitations. The Plaintiff is correct that case law in this circuit requires that "[i]n order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002); see also Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. Pendley, 767 F.2d at 1562; Davis v. Apfel, 81 F. Supp.2d 1289, 1291 (S.D. Ala. 1999) (involving similar medical impairments and similar procedural history to the instant case,

finding ALJ's decision not supported by substantial evidence when hypothetical to the VE omitted claimant's limitations with a key component of past relevant work).

In this case, the ALJ asked the VE whether a hypothetical claimant with Plaintiff's past relevant work experience, a high school education, the ability to read, write and speak the English language, and the ability to:

> lift and carry 10 pounds frequently, 20 pounds occasionally. To stand and walk for 6 hours out of an 8-hour day provided the job allows the duties to be performed in either a sitting or standing position. . . . cannot engage in constant reaching in all directions, and cannot engage in frequent overhead reaching . . . must work in a workplace that avoids concentrat[ed] exposure to the extremes of either heat or cold

could perform Plaintiff's past relevant work as a library assistant or medical assistant as customarily performed in the labor market. (Tr. 428-429). Plaintiff believes the ALJ's hypothetical was inaccurate because the ALJ failed to include Dr. Morford's recommendation for Plaintiff to "avoid repetitive hand use," despite the fact that the ALJ adopted Dr. Morford's RFC. (Doc. 12, p.20). Dr. Morford's RFC contained a hand-written notation next to the push and/or pull exertional limitations which stated "avoid repetitive hand use." (Tr. 324). This specific limitation was also bolstered by objective medical evidence from a treating physician who measured Plaintiff's grip strength as reduced to only 3/5. (Tr. 317). Plaintiff argues that the hypothetical the ALJ posed to the VE, which omitted such a limitation on repetitive hand use, is therefore inconsistent with the medical evidence.

In his decision, the ALJ states he adopted the VE's opinion that based on her RFC, Plaintiff could return to her past work as a medical assistant as previously performed by Plaintiff and as generally performed in the national economy. (Tr. 24).

However, repetitive hand use was a key component of Plaintiff's past work as a medical assistant as actually performed because she was gripping syringes, writing, picking up charts, lifting children onto the examining table, and assisting patients with undressing. (Tr. 411-12).  Moreover, there is no discussion regarding whether repetitive hand use was part of the medical assistant position as generally performed in the national economy.

The Commissioner asserts that Dr. Morford only intended to place a limitation on Plaintiff's "repetitive hand movements . . . in relation to pushing and pulling hand or foot controls." (Doc. 13, pp. 12).  The undersigned observes that Dr. Morford's handwritten notation "avoid repetitive hand use" is in the margin next to an exertional limitations category titled "push and/or pull (including operation of hand and/or foot controls)." (Tr. 324).  However, use of the word "including" indicates push and/or pull exertional behaviors are not limited solely to operation of hand and/or foot controls and could conceivably include other hand use.  At the very least, the ALJ should have addressed Dr. Morford's restriction on repetitive hand use and provided an explanation as to why he did not include it in the RFC and hypothetical posed to the VE.  Accordingly, the ALJ's decision that Plaintiff retained the residual functional capacity to perform her past work as a medical assistant, which was based significantly on the testimony of the VE, is not supported by substantial evidence.

### C.   Whether the ALJ erred in failing to properly evaluate Plaintiff's allegations of disabling pain and other symptoms.

Finally, Plaintiff claims the ALJ failed to properly explain, based on substantial evidence, his finding that Plaintiff's testimony regarding her pain and ability to work was not credible.  (Doc. 12, pp. 14-18).  Plaintiff testified she could not stand or walk for

-18-

prolonged periods, was unable to lift or carry anything heavier than a gallon of milk, could not stoop or bend at the waist, and became "dizzy or drowsy " from effects of her pain medications. (Tr. 19, 417). Plaintiff also testified her activities of daily living were minimal: she could not drive, had no social activities, and was unable to perform household chores or cooking. (Tr. 19, 419-22). Plaintiff testified these limitations were caused by unbearable pain in her neck and back, and radicular pain and weakness in her shoulders and arms. (Tr. 19, 411, 413-15).

Pain is a non-exertional impairment. Foote, 67 F.3d at 1559. The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, 67 F.3d at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). Once a claimant establishes through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce pain, 20 C.F.R. sections 404.1529 and 416.929 provide that the Commissioner must consider evidence about the intensity, persistence and functionally limiting effects of pain or other symptoms in deciding the issue of disability. Foote, 67 F.3d at 1561.

-19-

In this case, the ALJ did not specifically reference the Eleventh Circuit pain standard, yet it appears he conducted the correct analysis for pain and subjective complaints.  The first part of the pain standard, evidence of an underlying medical condition, is implicit in the ALJ's finding that Plaintiff suffered from severe impairments. Additionally, the ALJ specifically noted that the objective medical evidence of record does not establish the severity of impairments alleged by Plaintiff.  (Tr. 20).  With respect to the third prong, although the ALJ does not specifically state such, the ALJ must have found Plaintiff had objective medical conditions that could give rise to the alleged symptoms, because otherwise, he was not required to assess the credibility of Plaintiff's allegations.  The ALJ did proceed to examine the Plaintiff's credibility and found:

> [t]he claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the medical history, the reports of treating and examining practitioners, the degree of medical treatment required and the claimant's own description of her activities and life style.

(Tr. 19).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  Additionally, the Code of Federal Regulations sets forth seven factors that an ALJ should consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3)

precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medications used to alleviate pain or other symptoms; (5) treatment other than medication, received for relief of pain or other symptoms; (6) any measures, other than treatment, used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see also Social Security Ruling 96-7p.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  Dyer v. Barnhart, 395 F.3d 1206, 1212 (11th Cir. 2005).

Here, the ALJ examined some of these factors and provided several reasons for his determination regarding Plaintiff's credibility.[7]  First, the ALJ found the objective medical evidence did not support the severity of impairments as alleged by Plaintiff.  (Tr. 20-23).  Next, the ALJ noted Plaintiff's credibility was eroded by her inconsistent statements regarding her daily activities, her conservative treatment by the doctors, the lack of evidence supporting Plaintiff's claims regarding the side effects of her medication and her self prescription of a walking cane.  Plaintiff primarily takes issue with the ALJ's reference to Dr. Green's statement that Plaintiff "can do what she can" and the ALJ's statement that Plaintiff's EMG's were normal.  (Doc. 12, p. 17).

To support his finding that the objective medical evidence did not support Plaintiff's claims regarding the severity of her impairments, the ALJ noted "[n]one of the

---

[7]  Although the ALJ does not discuss each of the seven factors, this is not error as the Eleventh Circuit does not require discussion of all seven factors explicitly.  French v. Massanari, 152 F.Supp.2d 1329, 1338, n.6 (M.D. Fla. 2001) (holding that "it is not reversible error that the administrative law judge did not expressly mention the side effects of [the plaintiff's] medications in his credibility determination"); Bechtold v. Massanari, 152 F.Supp.2d 1340, 1349, n.9 (M.D. Fla. 2001), aff'd, 31 Fed.Appx. 202 (11th Cir. 2001).

claimant's treating sources have identified any specific limitations which were reputed to be based upon objective medical findings." (Tr. 22).  However, this statement ignores several notations in the records where both treating and consulting physicians referenced limitations supported by objective medical findings.  These notations include: significant weakness of the intrinsic hand muscles with grip strength reduced to only 3/5 (Tr. 317), inability to lift twenty pounds with both hands or squat more than ten inches due to back and right knee pain (Tr. 318-322), and the notation by Dr. Morford that Plaintiff should avoid repetitive hand use (Tr. 324).

Additionally, in arguing that the objective medical evidence did not support Plaintiff's allegations, the ALJ quoted part of a medical notation by Plaintiff's neurologist Jacob Green, M.D., Ph.D., that "'whatever she can do, she can.  It is up to her.'" (Tr. 21).  The ALJ concluded Dr. Green's statement "is an indication that [Dr. Green] found [Plaintiff] capable of some work activities on a regular basis."  Id.  Upon scrutiny of the record, however, the undersigned finds that the ALJ erred in interpreting Dr. Green's meaning by excerpting the quoted phrase from the full sentence: "I explained that SSI usually requires her to come in on a wheelchair on a respirator, but we will see whatever she can do, she can.  It is up to her."  (Tr. 222).  The full statement appears to gauge the likelihood of Plaintiff's success if she decided to apply for SSI benefits and does not appear to be a comment on Plaintiff's ability to work.

Plaintiff also argues that the ALJ erred in describing the results of Plaintiff's EMG Nerve Conduction Studies as being normal.  (Tr. 21).  The two EMG/Nerve Conduction Studies were performed on May 21, 2002 and June 4, 2002.  (Tr. 273-76).  Dr. Berger, who read both studies, noted that most of the electrophysiologic findings were normal.

(Tr. 273 and 275).  Plaintiff attacks the ALJ's description of "normal" by noting that the study performed on June 4, 2002 showed "active denervation of the (R) L4,5 paraspinal muscles."  (Tr. 273).  However, the study further stated that "the lack of denervation in the respective segmental innervated (R) leg muscles indicates this must be a relatively mild process."  (Tr. 274).  As the study results were predominately normal with only mild defects, the Court finds no error in the ALJ's description of the results of the EMG studies as being normal.

As for the ALJ's reliance on Plaintiff's inconsistent statements regarding her daily activities, the ALJ primarily relies on the report of the consultative psychological examination by Dr. Lucas in which Dr. Lucas noted Plaintiff "does her own laundry, watches some television, enjoys reading the Bible and the newspapers, attends church, and receives visits from friends."  (Tr. 23, 253).  The ALJ states that this is inconsistent with Plaintiff's statements to him during the hearing and her responses on the Hand ADLs list.  During the hearing, Plaintiff testified she could make her own bed, dress herself in a house dress, make some oatmeal in the microwave, watch some television and do word puzzles.  (Tr. 421, 426).  On the Hand ADLs list, Plaintiff indicated she could not do the laundry, tie her shoelaces, button or unbutton buttons, zip or unzip zippers, or wash dishes.  (Tr. 315).  The only inconsistency the Court notes is that Plaintiff stated she could do her laundry to Dr. Lucas on May 10, 2002 and then checked "no" on the "does the laundry" entry of the Hand ADLs list.  This inconsistency by itself is not enough to discredit Plaintiff's credibility.

Additionally, the ALJ seems to find persuasive the fact that Plaintiff had social contacts with friends and family as she lived with her sister and a nephew.  However,

the ALJ fails to acknowledge that the main reason Plaintiff lived with her sister and nephew is not to have social contacts but out of financial necessity.  (Tr. 426). Moreover, the daily activities the ALJ credits Plaintiff with admitting she can do are not sufficient to discredit her.  Indeed, the Eleventh Circuit does not believe "participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability. . . ."  Lewis, 125 F.3d at 1441.

The ALJ also bases his credibility assessment on Plaintiff's failure to undergo surgery and noting that Plaintiff "has consistently opted for conservative treatment."  (Tr. 21).  The mere fact that Plaintiff's condition would not benefit from surgery does not necessarily mean that Plaintiff's condition was not serious or that it did not cause her great pain.  Indeed, a neurosurgeon indicated Plaintiff was not a candidate for neurosurgery and "[i]nstead, he gave her an elbow splint and referred her to rheumatology for evaluation of fibromyalgia."  (Tr. 212, 269, 272, 299-300).

The ALJ also discredited Plaintiff's testimony based on her assertion that she needed to take a nap during the day (as a result of her medications making her drowsy) even though he claimed the evidence in the record indicated Plaintiff was active during most of the day.  (Tr. 23).  Interestingly, the ALJ does not cite to any of this alleged evidence showing her activity.

Finally, the ALJ found Plaintiff's use of a cane at the hearing further eroded her credibility because "[w]hile the claimant reported that she requires a cane to ambulate, there is no indication from the treatment records that she was ever prescribed a "walking cane" by a treating source to help with ambulation."  (Tr. 20).  Plaintiff's testimony, however, plainly states in response to a question from her own counsel that

her cane was not prescribed by a doctor but that the treating physicians at the pain management clinic told her she "could use it" if she "thought it would help [her] from stumbling." (Tr. 417). The undersigned finds such an explanation is consistent with Plaintiff's history of injuries sustained from falling and documented reports by pain management clinicians of Plaintiff limping. (Tr. 148, 365).

In sum, the reasons offered by the ALJ for discrediting Plaintiff's testimony, while specific, are neither adequate nor supported by substantial evidence. As such, the Court will remand the case with instructions for the ALJ to re-evaluate Plaintiff's credibility.

## V.   CONCLUSION

For the foregoing reasons, the undersigned believes the Commissioner's decision is not supported by substantial evidence and is therefore **REVERSED** and **REMANDED** pursuant to sentence four, 42 U.S.C. 405(g). On remand, the ALJ shall (1) assess Plaintiff's pain and credibility, providing explicit and adequate reasons based upon substantial evidence if rejecting Plaintiff's allegations, (2) propound a hypothetical to a vocational expert that clearly sets out all of Plaintiff's limitations or provide adequate explanation for failure to include a limitation on repetitive hand use in the RFC and (3) conduct any other proceedings deemed appropriate. The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida, this _20th_ day of June, 2007.

*Monte C. Richardson*
————————————————
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:
Counsel of Record